Our next case is Midwest Athletics and Sports Alliance LLC v. Xerox Corporation, 23-1077. Mr. Andre, did that come out so right? It did, John. Thank you. You have received three minutes for rebuttal. That's correct. We're ready when you are, sir. May it please the court. We have a lot of issues at stake on this appeal. Seven patents were taken out by the District Court of Summary Judgment. We'll start with the 285 patent on the one-on-one issue. This was a patent that was not written in the means-plus-function claim language. It didn't have the words means in it. Xerox proposed the means-plus-function, and they overcame the presumption that there was no means. So the district court ruled that two terms were means-plus-function terms. She actually described a physical structure tied to specific algorithms that performed a defined function. Now, at that point, I think that takes it out of the one-on-one realm, the realm of abstract. There's not a single case we could find on point where a clearly defined concrete structure that performs an algorithmic step of a defined function that was declared to be on one-on-one. No cases were cited here where that was the case. We're not locating anything of that nature. I don't understand what you're saying. Are you saying that if there's a physical structure like a computer that does an algorithm, that that takes it out of one-on-one? No, that's not what I'm saying. Well, what are you saying? I'm saying in this particular instance, the means-plus-function claim, where you have a defined structure, physical structure, that does a very specific. Okay, don't use vague language. What physical structure are you talking about here? The district court ruled that the structure was a database management system within a digital front-end controller coupled to an OCR device and a computer. So it's a database management system. Well, that goes on. That can be a lot. It's a program, isn't it, running on a computer? It can be. And then a digital front-end controller. Are you saying a program running on a computer is never possibly ineligible under one-on-one? Absolutely not, Your Honor. What I'm saying is when you have a physical structure, as defined here, in a means-plus-function claim, and it defined very specific the digital controller coupled to the OCR. What's the controller? It is a device in a printer. This is a printing technology. It's a device in a printer that controls the print job. You just defined it by saying the same word. I wouldn't know how to describe it otherwise. It's a specific component in a printer used to, you know. Is it hardware or software? It's hardware. So it was defined as the physical structure. But that's not what the claims are directed to, right, a new kind of controller? Well, the claims are directed to a way of being able to monitor the OCRs, operable replacement and replaceable components. And something was vastly needed in the industry so you could have less downtime on your printers. And the district court went in and found that there was a means-plus-function presumption that there was a physical structure, and then it gave a couple columns of algorithms to perform the function. Why do you think it should logically follow that that resolves the 101 issue? I guess I'm imagining in Alice that instead of just saying computer, it said, well, what do computers have? They have controllers in them. They have memory in them. They obviously have input-output processes for the controller to put stuff into memory and take stuff out. And now we have a database, a data management system that would be utterly generic. And that could not have made a difference in Alice when the Supreme Court said the fact that you're referring to a computer isn't enough unless you're doing something, you know, Enfish-like, about introducing some arguably new way of performing those basic functions. I think your argument is exactly correct. That's what the specific algorithm is talking about. In this particular case, it's just not a general computer. It is a database management system within a front-end digital front-end controller coupled with the ORC, which is another device. And the ORC is? It's an operation and replaceable component. So a replaceable component. That sounds like as generic as possible, like just a part that I don't have to call the manufacturer to come and do something with. It means I can take it out and I can put a different one in. That's all that is. A field technician can change out the… Right, and the data management with the front-end. The digital front-end controller. That's what I was trying to pick up when I said in Alice, if they had said the computer, which obviously has an input-output and it has memory and it has a way of controlling what goes in and what's coming out, I don't know that those terms are the terms that I guess were identified as the structure here are any less generic than the computer, with a few extra words, would be in Alice. Well, I respectfully disagree. This is much more specific than just a general computer. This is a specific implementation, just like the case in the Grove and progeny cases thereafter. This is a very specific implementation of the database management system and it's within the DFE, I think they call it, or DFC, and it's coupled to these other physical components. So it's a very specific implementation that takes it outside of the Alice standard. And that's the point I'm trying to make is, you know, if it's just a generic component with no other description and no function, and in this particular instance, the function was set forward by referring to a figure, to block diagram as a figure, and then two columns of algorithms, how that is actually achieved, the description of it. So you have a very, very specific implementation of these physical components. So this takes that right outside of the one-on-one issue with respect to the 285. If I'm referring to claim, which claim term, let's use claim one, is that okay? That's what I have before me. Are you saying is a means plus function term? The court held that there's two terms of means plus function, a use mechanism and a comparison mechanism. And your argument is that somehow because this is means plus function, it's given some sort of formality to the finding of the court as to corresponding structure, and once the court says there's corresponding structure, that now we have to say this is non-abstract. It's a corresponding structure with a specific implementation of how the function is achieved. It's not the case where we have, where that's our precedent. I think McGraw is saying that. I was able to find a single case which this court looked at a means plus function claim. Can you tell me what use mechanism is? I can give the court's construction. When we adopted the court's construction, we were not appealing that construction. But the court's construction was, it was a means plus function claim. The structure was the database management system we talked about and performed the steps of Figures 4, 12, Steps 4, 12, and 4, 14 of Figure 4, which are described in Columns 3 through Columns 4, essentially, two full columns. So that's the algorithm. So the use mechanism in this particular case... Are you saying an algorithm is by necessity not an abstract idea? No. I think it's a specific implementation of the structures that are found... So an algorithm, if the algorithm is itself an abstract idea, and it's implemented on conventional equipment, that's Atlas, right? It can be. Well, it is Atlas. Atlas was some formula or something done on a computer, I think. That's ineligible. So your argument hinges on the database, whatever you're talking about, being somehow the inventive concept here, not the algorithm? No. I think your problem is you have an idea about sending notifications to people to say, this part needs replacing, and somebody can replace it on site rather than call some service technician. That's what this is directed to, right? That's the idea this is directed to. And it uses completely conventional equipment to do that. I would respectfully disagree here. But what did this patent invent in terms of equipment that's not conventional? Well, they put together the claim as a whole in a word of combination. But what equipment did they invent? Because we have said time and time again, you can put together a computer with a camera with a sensor, and if it's all conventional equipment, implementing it in an abstract idea, and that's what your patent is directed to, then it's ineligible. So I don't understand what you think you've invented here beyond the abstract idea. Well, I think there are, if you look at the claim as a whole, the concept of having an alert provided to someone outside of their… That's abstract. Okay. Doing it through a computerized mechanism attuned to specific features of devices. Conventional. Well, I respectfully disagree. Okay. And also I think that step two of the 285 also analysis is also an issue. Can I just ask, you have a bunch of non-101 issues here. Do you want to say something about the ones you're particularly interested in? I don't think we're going to get through all of them. Yeah. Cite to the one you think is strongest, because we do have a lot of material here. There was a lot of patents taken out. That's correct, Your Honor. I think I want to turn to the non-infringement opinion on the 314 and 914 patents. There are two issues here. One is the fact that there is a claim restriction issue on input device. The input device here is a physical device only, and that reads a preferred environment of the graphical user interface that's in the specification. So the claim restriction there was limited to just a physical environment of the input device. And that claim restriction, if it's overturned, then you'd have to grant it back for the finding, obviously. One thing I was, I think, confused about, maybe I shouldn't have been, so there's talk about how on the display there can be icons referring to choices that the user can make. Is there a dispute about whether those icons on the display are an input device, or if the icon is for a mouse, whether it's only the mouse that would be, with a clicker on it, obviously, would be the input device if hardware is needed? That's what I'm trying to understand. Yeah, the way the court construed input device was it had to be a physical input device, it had to be something like a mouse would be an example. Keyboard or a mouse. Keyboard or a mouse, something of that nature. Microphone or something. And it could not be the graphical user interface. The specification. What about a touch screen? No. Well, a touch screen would not be considered. Is that an issue here? I don't think it was an issue. It was the graphical user interface. And with respect to that, those two claims as well, there was an issue with the experts being stricken, the opinion being stricken because of a motion that was filed after the claim stretch came out to put in an indirect infringement claim. So, factually, the court just got it wrong, strictly the wrong part of the expert's opinion. If you look at the timeline of it, it was such that the opinion on the physical components being in the accused products was done on October 25th, 2019, and the motion to prolete, to supplement the infringement contentions was done two years later. That was denied, but the previous contentions were in there. We've used most of your time, all your story. Unless you want to go on, you can go on if you want. I'll reserve the last minute half. Okay. I'll take what I can get. All right. Mr. Perito, did I pronounce that correctly? You did. Thank you, Your Honor. May it please the Court. I want to start by talking about the 285 patent, Claim 1. And, Your Honor, Judge Hughes, you asked, you know, what is the use mechanism? And the use mechanism is that generic controller computer, the DFE. It's a database, and it's- I'm sorry, what's DFE? Acronyms are just terrible. My apologies, Your Honor. That's the digital front end. Thank you. And it's simply a controller. It's a generic computer, and it gets page counts and adds files to a database. So totally conventional, no purported improvement in the computing function, in the database function. What's your response to your friend on the other side that says that the computer here is a specialized computer? So the patent actually says that the digital front end is just a generic computing device. And that is at- The 285? Yes, Your Honor. The 285 patent. Sorry. And that's Appendix 304, Column 2. And that's lines 55 to 60, that generally virtually any interactive device can function as a DFE controller. It's just a generic computing device. And Xerox's expert, Dr. Murch, in his report at Appendix 21-350, explained that as of the time of the claimed invention, database management systems within these digital front end controllers are well understood, routine, and conventional. That's uncontradicted in the record by plaintiff's expert. What we have, even in Claim 1, is just a set of steps. It is a claim to data collection, data analysis, data display. That is a classic information-based claim, and that's an abstract idea. There's nothing that takes that out of the realm of abstract ideas. And Massa didn't identify, either below or before this Court, any particular aspects of that 112 structure that provides some sort of inventive concept. Unless Your Honors have further questions on 285, I'd like to turn to the claim construction issue with respect to the 974 Patent Claim 2 and the 314 Patent Claim 1. Is that what he argued? That is. That's input device, Your Honor. And so, as we must, we begin with the language of the claims. 974 Claim 2 claims a job submission station that has a computer and an input device connected to said computer for said job submission operator to input instructions. And the specification further sets forth, and that's at A287, line, Column 2, Lines 32 to 34, that an input device, such as a keyboard or a mouse, close quote, is used to provide input instructions to the computer. So we clearly have hardware. And in the context of the claims of the 314... Would a touch screen on a display be hardware? Absolutely, Your Honor. Actually, the district court adopted a construction that was agnostic as to the type of hardware. Any sort of input hardware would be encompassed by the district court's construction. Similarly, the 314 Claim 1 is a claim to an interface that is implemented in a computer and it includes, in its first limitation, a display, which the court construed to require a physical monitor. So indisputably, hardware steps required, hardware elements are required by Claim 1. And it also requires this first input device for selectively associating visual representations. That's the required hardware that enables you to interact with the graphic user interface. The graphic user interface is separately claimed in other limitations of that claim. Claims to the document object, the document ticket object, the page object, and then visual representations. So the GUI is claimed, as are the necessary monitor and input devices to interact with that GUI. I'd like to ask you about something that Mr. Andre didn't have time to address, but that's in front of us and so we actually do need to decide it. And it's this pair of issues, I guess it's the 582 Claims 1 and 5 and the 415 Claim 1, in which something, two different products, there's one called TEC and one called Duplo, that when combined with the Xerox machine, and you'll please just make this correct if I get it wrong, are asserted to come within the claims, like some of the claims are method claims, some of them are systems, so let's use the inaccurate but informal that those combinations infringe the claim when we're really talking about use or making. And we're only talking about direct infringement. So the question is, would Xerox, is there enough evidence that Xerox, when it, as I understand it, promoted the ability of its machine to be used with these two different products, saying that the products, either that the products were specially designed for use with Xerox or that the machines were specially designed for use with those products, why that isn't sufficient evidence to allow a jury to conclude that Xerox, in all likelihood, actually tested the combination? There are a few pieces there, and I want to take them in turn if I could, Your Honor. You're right, there are these two third-party coders.  Coders, yes. Coder. And these third-party coders satisfy the last limitation of each of the system and method claims. The 582. If I remember right, your red brief says, sort of, I'll stipulate to that, but there isn't evidence that all the other elements are met by the combination. And I remember thinking, tell me an element that is not part of that combination, and I don't remember your ever specifying one. That's what I'm focused on. Absolutely, Your Honor. So the combination for the 582 requires first forming this five-color image, and then depositing on top of that clear ink. And it has to be deposited in a special method. It has to be deposited as a receiver and image-dependent inverse mask. So it's not just any deposition. And then you have to perform a gloss enhancing process that happens with the coder. Similarly for the 415 patent, you have to print in five colors, you have to do an overcoat, and then you have to use this gloss enhancing process. There is no evidence in the record that Xerox has ever instructed its users to perform all of those steps. At least my recollection is that indirect infringement is off the table. We're only talking about direct infringement. I think they maybe made an attempt to get indirect infringement in, but that was too late, right? It's something like that. So we're only talking about, at least what I'm interested in, is Xerox itself, direct infringer, has testing what it is promoting. And I think that's where the disconnect is, Your Honor. I was referring to the fact that Xerox has never promoted all of those steps. There's no question that Xerox has tested its products, but the question is whether Xerox has tested this highly unusual configuration of not only its product, but also a third-party product altogether. An answer to the following question would help me in my current way of thinking about it. Yes. Tell me whether it would matter, I think, if there was a use that somebody might make of the combination of the Xerox machine and one or the other of the coater that is worth promoting that doesn't involve some of the other steps. Or is it true, or is there evidence, might a jury find, that if you're promoting the use of these coaters, there's really only one reason you would be promoting it for the performance of all the steps? No, and that's because this is an optional, highly specific configuration. So you might use a coater without the particular kind of masking? Absolutely. So there are many ways that you could do this, Your Honor, that don't infringe. Do you have evidence of that? Absolutely, to the extent that we have a declaration at, and this is from Christine Keenan, who is responsible for the product at Xerox, and that is at 28.8.18 that describes this unusual process and how the printer actually doesn't even come standard with the ability to use a fifth color station, that you have to buy the clear ink optionally. And Moss's expert even admits that the training materials, the promotional materials, don't instruct to perform all of these unusual steps. And I'll point you there to Appendix A25.617. So there's some evidence of use, but just not sufficient, right? I thought I heard you say there's no evidence in the record as to use by Xerox. There is no evidence in the record as to use by Xerox of that full system with all of those steps. There is evidence that Xerox performed some testing of the machine, but no evidence that this highly unusual configuration was ever tested. The testing was something different than working with the third party coders. Sorry, Your Honor, could you repeat that? The testing is different. It's something separate than the allegation that Xerox used the patent when it was working with third party coders. The only allegation of an actual infringement would be that Xerox had tested its own machine in this configuration and also tested it with a third party coder. That could be the only way that the claim is infringed under Moss's infringement theory. And there's just no evidence at all of that. It's speculation by the expert. And only speculation that it would have been natural to test the machines. With the coder. With the coder, but not even to test every single aspect of this process. If Your Honors don't have further questions, we'd ask that the Court affirm. Thank you very much. With my last minute, I'll just pick on that point. There was evidence in the record, and I think there's sufficient evidence at least to create a material issue of fact, that Kodak does testing in an infringing manner. They specifically talk about how the third party coders are specifically designed, uniquely designed to work with the Xerox presses, you know, the printers. But I don't remember seeing in that evidence, this is Dr. Kahn? Dr. Kahn. Yeah. He's saying one way or the other that these coders could be used with the Xerox machine in ways, only in ways that also meet all the other elements of the claim. That was Dr. Kahn's opinion. That's correct. No, no. I don't remember his ever addressing the full set of elements of the claims, either the method claims or the system claims to which all this pertains. Only that, well, if they're advertising, if Xerox is advertising its product as designed for use with these coders, which are specifically designed to work together, I thought the key argument that Xerox is making is even if that's true, that's not enough to be evidence that there was testing of all of the elements. Yeah. I think where the disconnect is here is we had extensive, you know, multi-hundred-page expert report where Dr. Kahn put all the elements in, but what's on appeal here is these third-party coders. That's the basis for the summary judgment issue. So here, what's on appeal is, is there evidence to show that the third-party coders were used or tested by Xerox? And if so, that's a material issue of fact that should preclude summary judgment. That's something that the district court did not consider, and so I think that's what's on appeal for this court today. And then, likewise, just with my last minute, I do want to talk about the indefinite argument on the 278 patent. The term markedly greater... Did he talk about that? No. If you probe him down to it, I'll rest on the papers. If you have questions... If it hasn't come up before, you can address it. Yeah, I ran out of time. I appreciate the court's indulgence. Thank you. Thank you. We thank the parties for their arguments, and we'll take this case under advisement.